## Case No. 4,350.

### The ELIZABETH.

[Blatchf. Pr. Cas. 250.][1]

District Court, S. D. New York. Nov. 17, 1862.[2]

BETTS, District Judge. The libel in this case was filed July 7, 1862, alleging that the

[1] [Reported by Samuel Blatchford, Esq.]
[2] [Affirmed in The Elizabeth, Case No. 4,351.]

vessel, with her cargo, was captured, as lawful prize, by the United States steamer Keystone State, William E. Le Roy, of the United States navy commanding, on the 29th day of May, 1862, on the Atlantic ocean, off Charleston harbor. The monition issued on the libel was made returnable, and was returned in court, on public proclamation, July 29 thereafter; and thereupon Pierrepont Edwards, the acting British consul for this port, intervened, by his proctor, for the interest of the owners of the steamer and cargo, and filed a claim in that character thereto, as being owned by British subjects out of the jurisdiction of the court, and subjoined to the claim his own test oath to such ownership, his knowedge, as stated by him, being acquired "from his position as present acting consul in the port of New York, and from conversation with the master and crew of the above steamer Elizabeth." No other claim or answer was interposed in the case. The proctor and counsel for the claimant appeared on the trial, and, after the ship's papers and the preparatory proofs were heard, put in various points or objections against the condemnation of the vessel and cargo, and submitted the cause to the decision of the court thereupon, without oral argument. Written points were also submitted on the part of the libellants.

The vessel had a British certificate of registry, issued at Nassau, N. P., to John Holmes Hanna, of New Orleans, merchant, dated February 6, 1862. She is certified to have been built at Glasgow, July 29, 1859, and the registry states that her foreign name was "General Miramon, formerly Pagnes Coneo."

The vessel was cleared at Nassau. The clearance and shipping agreement with her crew were dated at that port in May, 1862, for St. John, New Brunswick. Her pilotage out was receipted at Nassau, May 24, and she went to sea the 25th, and was captured some thirty miles or less out from Charleston, May 29th, at about 7 a. m. No log-book was produced with the papers, and no evidence of the course the vessel pursued from Nassau, or of the state of the weather or the speed of her progress. She was a steam propeller. As Nassau and Charleston are situated about two degrees of longitude and seven degrees of latitude apart, and the period occupied by the prize in making the transit from her place of departure (in latitude about 25° north, and longitude 77° west) to that of her arrest (in latitude about 32° north and longitude 79° west) must, from the circumstances, have been less than four days, her course from the one to the other point must, obviously, have been as short in time and distance run as would be ordinarily practicable, and, being accomplished so promptly, could not be presumed, in the absence of all proofs to the contrary, to have been retarded by baffling or adverse weather, or by deviation from a direct track. On the contrary, her position west of the Gulf Stream, thirty or less miles out from Charleston, in five or six fathoms of

water, would denote that her destination had been in search of a port immediately at command on the route she was running, rather than to St. John, in New Brunswick, many degrees of longitude east and latitude north of the place of her arrest. These palpable circumstances bear strongly against the integrity of the representation upon the clearance and shipping agreement, and in the testimony of the master, that the voyage was destined for St. John, New Brunswick, and not to Charleston; and that distrust will not be found removed or diminished by the tenor of the proofs in preparatorio.

The crew consisted of twenty-one persons, including the master, two mates, two engineers, a steward, a cook, a cabin boy, five seamen, and five or six negroes. Of this number only the master and the cabin boy were produced and offered as witnesses before the prize commissioners for examination. No reason was assigned to this court at the hearing of such limitation of the number of witnesses examined. The counsel for the claimants, on the argument, excepted orally to the regularity and sufficiency of the proofs so returned, and filed his exception in writing, as a point of defence in law to the suit. The existing 12th prize rule of this court (and the standing rule, from the earliest compilation of the rules has been substantially the same) is direct and positive, that the captor shall produce to one of the commissioners three or four, if so many there be, of the company or persons who were captured with or who claim the captured property. And in case the capture be a vessel, the master and mate or supercargo, if brought in, must be two, in order that they may be examined by the commissioner in preparatorio. The rule of this court corresponds, in substance, with the practice of the other district courts of the United States, with that of the continential government during the revolutionary war (5 Wheat. [18 U. S.] Append. 118, art. 6), and with that of the supreme court (1 Wheat. [14 U. S.] Append. 496). The English and our continental practice is founded upon the like principle (God. Adm. Ins. 25, 26; The Dame Catharine de Workeem, 1 Hay & M. 244), though it does not appear, with other jurisdictions, to rest in general rules, but to be governed by specific instructions of the judge, and, at his discretion, limited to one or more witnesses (Marriott's Formulary, 32). During the revolutionary war instructions were given by congress to cruisers to bring in one or more witnesses from the prize for examination (5 Wheat. [18 U. S.] Append. 118), and by the president, to private armed vessels, to bring in the master and one or more of the principal persons (2 Wheat. [15 U. S.] Append. 81, art. 4).

The omission on the part of the captors to observe the requirements of the rule in this respect is an irregularity which, if properly taken advantage of by claimants regularly intervening in the suit, might lead to the re-

jection of the proofs offered in that condition, or compel the libellants to show adequate cause for the omission to produce and have examined before the prize commissioners the required number of witnesses out of those found on the prize at the time of its seizure. The rule is not one of positive law, constituting a prerequisite to a right to a condemnation on the part of the libellants, and is, therefore, subject to explanation or excuse conformably to the substantial rights and equities between the parties litigant.

The capture was made May 29, 1862. The prize was delivered to the commissioners of prize in this district, as appears by their register, on the 4th of June thereafter, and the examination in preparatorio of the two witnesses whose testimony was produced on the final hearing was taken and certified the next day, June 5. The libel was filed July 7, 1862. No reason is assigned for that delay; but it is a probable inference that a pause in the proceedings occurred on account of the small proportion of the ship's crew first produced for examination, and to await the presentation of others subsequently. Nothing appears upon the pleadings or papers introduced by either party in relation to the subject; and, on the 29th of July, the British vice-consul for this port intervened and filed the claim in behalf of British subjects, before referred to, as owners of the prize property at the time of such appearance, and persons out of the jurisdiction of the court. He was a competent party to the end. 1 Kent, Comm. 43; The Bello Corrunes, 6 Wheat. [19 U. S.] 152. An affidavit of the intervenor, appended to the claim on his test oath thereto, asserts the belief of the deponent in the allegations of the claim, and that he acquired his knowledge of these matters from his position as acting consul in the port of New York, and from conversations with the master and crew of the above steamer Elizabeth.

The parties are authorized by the prize rules (rule 13) to attend personally, or by their agents, the examination of witnesses before the commissioners; and the presumption is, accordingly, forcible that it was well known, when the claim was interposed and filed, who of the crew had been examined as witnesses, and what testimony had been given, as well as the reason why no greater number was produced. No other party has supplanted the official intervenor, or assumed to take charge of the defence; and the exception he raises to the alleged irregularity in practice, in giving in the proofs, could have been as well known to him or his proctor at the inception of the suit or the presentation of his claim, as at the time of the final hearing on the issue. And there is no intimation in any judicial recognition of its official powers which indicates that they exceed the legal authority of the principals he may represent. No privilege or immunity in respect to ques-

tions of irregular practice on the part of the libellants in the prize commissioner's office, or otherwise, is reserved to a consular representative in court, in managing a defence to the action, which could not be exercised by the owners of the property seized. The defectiveness of the proceedings complained of must, in contemplation of law, have been known to him when the evidence was given, as fully as at the present term of the court, when the exception is first suggested. It was therefore, palpable laches to withhold the objection to the mode of taking the proofs until the hearing on the merits in court, and the motion to exclude or disregard the depositions because additional portions of the crew were not added must be denied. It is a principle governing the proceedings of all judicial tribunals, that the neglect by a litigant party to bring forward at the proper period objections touching the form and regularity of the acts of his opponent in conducting his cause in court shall be deemed to be a waiver of such objections, or equivalent to an admission that, if they had been made known, the other side could have satisfactorily removed them. Graham, Pr. 566; Tidd, Pr. 533; Rowan v. Lytle, 4 Cow. 91; Jones v. Dunning, 2 Johns. Cas. 74.

But it appearing upon the depositions read on the hearing that a large number of persons, being the crew and passengers of the vessel at the time of her capture, and captured with her, have not been examined as witnesses in the suit, and no excuse being furnished for the omission, the court will suspend a final decree in the case until the libellants furnish satisfactory evidence to the court, by depositions filed within ten days after this order, that the omission to examine the number of witnesses required by the standing rule of the court arose from reasonable and justifiable cause, and was not owing to any culpable or improper purpose on the part of the prosecution. This order is made that the court may be well satisfied that all the proceedings have been fairly conducted in pursuing the condemnation of the prize, and not because of any regular or lawful defence interposed in the suit, which renders the proceeding therein other than one of entire default and absence of defence in the suit on the part of the owners of the property seized.

November 12.—Interlocutory order. An objection being taken in court by the proctor of the official claimant, on the final hearing of this cause, that the number of witnesses required by the stated rules of the court to be examined in prize suits were not produced by the libellants, and examined in preparatorio by the prize commissioners, although it is considered by the court that the objection is not available in law to the claimant, yet the court, in protection and enforcement of its standing rules, and in support of the ends of public justice, will,

ex suo motu, notice an omission of its officers to observe and comply with those rules: therefore, it is ordered that further proceedings in this cause, upon the proofs now before the court, and the motion of a decree of condemnation and forfeiture of the property under arrest, be suspended for ten days after notice of this order to the district attorney and the proctor of the captors, with leave to the libellants to submit, within that time, proofs to the court showing why the rules of court in that respect have not been complied with in this suit.

November 17.—Affidavits presented this day by the assistant district attorney and the counsel for the captors in the cause, with the evidence in preparatorio, show that, on the capture of the prize, her crew, except the two witnesses examined and two or three colored men, were separated from the prize vessel because of the largeness of their number and the smallness of the vessel, and were transferred to the public ship, the Bienville, and were brought by that ship into the port of Philadelphia; that part of the crew have never been transmitted to this port, and, it is believed, were allowed to disperse; that the negroes accompanying the prize were not sent in for examination, because it was considered they were stupid and unintelligent persons; that the master of the vessel and the cabin boy, a young man nineteen years of age, were produced for examination; and that the other portions of the captured crew had, as is supposed, been discharged from the Bienville, at Philadelphia, as not needed for witnesses. This evidence satisfies the court that no malpractice has intentionally been allowed in the case and that the failure to produce other witnesses from the prize crew is the result of misapprehension or accident, and not of any purpose to disregard a full observance of the rule of court.

The libellants insist, upon the case as it now stands, that the facts presented in the ship's papers and the preparatory proofs place the vessel and her cargo in the class of those adventures so common and so frequently made the subject of adjudication in this court during this war, in which vessels and cargoes assume to be engaged in a neutral trade to or from the port of Nassau, but are, in reality, covered with proofs that the purpose and effort of the enterprise is to carry cargoes into, or to bring them from, the blockaded ports of the adjacent seceded States, in violation of the blockade, and in fraud of the rights of the United States under the law of the nations.

In addition to the pleadings and evidence previously before the court, a paper log-book of this last voyage of the vessel is now laid before the court by the counsel for the claimants, with the assent of the counsel for the libellants, as being one which was left in his charge by the master of the prize when she

arrived in this port, and was accidentally not sent with the ship's papers to the prize commissioners. This document changes the evidence already in the case only in fixing with more precision the times and places of the beginning and ending of the voyage. Her departure was at latitude 27° 55′ north, and her arrest at latitude 32° 19′ north. She left Nassau, Sunday, May 25, 1862, towards St. John, N. B. Royal Bay was, at 4 p. m., south-southeast, ten miles distant. The vessel was brought to and arrested the Thursday after at 4½ a. m. On Wednesday, the 28th, the log notices "coal getting short and water likewise."

The argument is still maintained for the libellants—1. That the vessel is enemy property; 2. That the cargo is contraband of war; 3. That the papers are simulated and false as to the real destination of the vessel; that the voyage was undertaken and prosecuted with the intent to run into Charleston, and that the vessel was captured while making that attempt.

The claimant denies these positions, and urges—1. That the evidence required by the rules of court has not been furnished by the libellants; 2. That the evidence of the cabin boy is inadequate proof against the vessel; 3. That a neutral ship can carry any description of cargo. 4. That the residence in any enemy port of the neutral owner did not render the vessel enemy property at the time of her seizure, May 29, New Orleans having been open to the general commerce, by proclamation, May 12, 1862.

The vessel was owned in New Orleans, by Hanna, when the master was appointed to her. He was put on board of her by the owner at Mobile in December, 1861. The crew were reshipped by the master for the last voyage in May last. The vessel carried two small brass guns forward. The master says that the vessel, on the voyage on which she was captured, was bound from Nassau to St. John, N. B., and back to Nassau. She carried a full cargo, consisting of castor oil, kerosene oil, tin, lead, rifles, sabre blades, saltpeter, dry goods, and casks of some kind of hardware. She had on board goods contraband of war. The vessel went, in December, 1861, from New Orleans to Mobile; thence, with a cargo of spirits of turpentine, to Havana; thence, with another cargo, to Nassau; and thence to New Orleans, where she arrived February 20, last. Thence she carried a full cargo of cotton to Havana, and there took on board a new cargo, and proceeded to Nassau, where she received part of a new cargo, and started on the voyage on which she was captured. When the vessel went from Havana and Nassau on the previous voyage, she cleared for Matamoras and went to New Orleans. The cargo captured was shipped and claimed by Henry Adderly & Co., of Nassau. The master says that he does not know who were the consignees of the cargo, or that Adderly & Co., had any

interest in it; that he had heard at Charleston and southern Confederate States were under blockade, and that he believes that Charleston was actually blockaded at the time of the capture of this vessel, as a number of blockading vessels were lying there. When the prize discovered the capturing vessel, she was about four miles off, and the prize altered her course. When the first gun was fired by the capturing vessel, the prize was then heading not towards Charleston, but outward and towards the Gulf Stream. The Gulf Stream would be the direct course from Nassau to St. John. The prize was about two points off that course when taken, and was then endeavoring to get back to it. The cabin boy testifies that the vessel was captured in about three fathoms of water, because she was charged with attempting to run into Charleston; that he resides at Nassau with his father, an Englishman, and supposes that Adderly & Co., owned the vessel, because they advanced; that he was shipped at Nassau with the rest of the crew, at a shipping office there; that the vessel first sailed from Nassau to Havana, with a small cargo of coal for the steamer's use, and then back to Nassau; from which place he supposes the vessel intended to run the blockade of Charleston, although, by the shipping articles, she was destined to New Brunswick; because it was generally so understood by the crew, just after leaving Nassau, because the vessel had arms and warlike materials on board, and because she went so close to Charleston; and that the vessel, when she ran over to Havana from Nassau, took nothing but fuel for her own use, and brought back several square boxes (the contents of which he did not know) to Nassau, and then immediately had loaded on board, without landing the boxes, arms, munition of war, and other merchandise.

The evidence, from the preparatory examination, that the prize ran from Nassau to Havana for a portion of the cargo on this her last voyage, and returned directly thence to Nassau, and there, without unlading that portion on her return, took in, at the latter port, the residue of her lading, gives great significancy to the observation in the logbook, before quoted, as, unless the voyage then proposed to be continued was to be a very short one, it is incredible that the steamer should be sent to sea with water and coal not sufficient to supply her for four days. Some part of this short period, as also appears from the log, was run under sails only.

Without dilating upon the facts thus placed before the court, I am clear in the conclusion that this vessel had not acquired a bona fide neutral character at the time her last voyage was undertaken; that St. John, N. B., was not the true destination of her voyage from Nassau, whence she last sailed; that her papers in that respect are simulated and false; that she had on board articles contraband of war, intended for an enemy port;

that she was arrested in attempting to carry such articles to such port; that her owner, her master, and the owners of her cargo well knew of the blockade at Charleston, and that it was efficiently maintained, and, under that knowledge, endeavored to break the blockade; and that the vessel and cargo were seized in the attempt to carry out that intention.

A decree of condemnation and forfeiture of both vessel and cargo is ordered to be carried into effect.

This decree was affirmed, on appeal, by the circuit court, July 17, 1863 [Case No. 4,351, following].